Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Joseph S. McMillen (SBN 174561) *jm@mckennonlawgroup.com*
**McKENNON LAW GROUP PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone: 949-387-9595 | Fax: 949-385-5165

Attorneys for Plaintiff, Stephanie Jensen

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

STEPHANIE JENSEN,

Plaintiff,

vs.

DEARBORN NATIONAL LIFE INSURANCE COMPANY, a corporation doing business in California; and DOES 1 - 10,

Defendants.

Case No.: 5:17-cv-07320-EJD

<u>Assigned for All Purposes to</u>:
District Judge: Hon. Edward J. Davila
Magistrate Judge: Virginia K. DeMarchi

Original Action Filed: 9/29/17
First Amended Complaint Filed: 11/27/17
Trial Date: None Set

**PLAINTIFF STEPHANIE JENSEN'S OPPOSITION TO DEARBORN NATIONAL LIFE INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Date: May 23, 2019
Time: 9:00 a.m.
Place: Courtroom 4
280 South 1st St., Rm 2112
San Jose, CA 95113

[Filed Concurrently With:
- Responsive Separate Statement;
- Declaration of Stephanie Jensen;
- Declaration of Joseph S. McMillen; and
- Declaration of Laura Parker]

**TABLE OF CONTENTS**

1. INTRODUCTION ....................................................1

2. STATEMENT OF RELEVANT FACTS ....................................3

3. THE COURT MUST DENY DEARBORN'S MOTION FOR PARTIAL SUMMARY JUDGMENT ....................................................6

A. Dearborn's Difficult Summary Judgment Burden ....................6

B. Dearborn Is Equitably Estopped from Asserting Its Statute of Limitations Defense ....................................................6

C. Dearborn Breached the Covenant of Good Faith and Fair Dealing Implied in Its Group Disability Policy ....................................8

1) The Bad Faith Standard ....................................8

2) Dearborn Breached the Covenant by Terminating Ms. Jensen's Disability Benefits Based on Absurd Logic and a Cursory Investigation Rather than Thoroughly Investigating with "An Eye Toward Finding Coverage" as Its Good Faith Duty Required ....................................................9

3) Dearborn Breached the Covenant by Intentionally Misrepresenting to Ms. Jensen that ERISA Applied to the Policy, Entitling Her to Bad Faith and Punitive Damages ....23

4. CONCLUSION ....................................................25

# TABLE OF AUTHORITIES

## Cases

*Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365 (9th Cir. 1985) ................................7
*Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152 (9th Cir. 2002)................10
*AMCO Ins. Co. v. Madera*, 2006 WL 2091944 (E.D. Cal. July 26, 2006) .16, 17, 22
*Anderson v. Allstate Ins. Co.*, 45 F. App'x 754 (9th Cir. 2002) .............................12
*Bravo v. U.S. Life Ins. Co. in City of N.Y.*, 701 F. Supp. 2d 1145 (E.D. Cal. 2010)......................................................................................18, 19
*City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455 (2008)....................12
*Cook v. Liberty Life*, 320 F.3d 11 (1st Cir. 2003) ................................................15
*Davis v. Blue Cross of No. Calif.*, 25 Cal.3d 418 (1979)…………………………23
*Delos v. Farmers*, 93 Cal. App. 3d 642 (1979) ......................................................24
*Egan v. Mutual of Omaha*, 24 Cal.3d 809 (1979) ..................................................10
*Fifield v. HM Life Ins. Co.*, 2012 U.S. Dist. LEXIS 140880 (D.N.H. 2012)..........12
*Frommoethelydo v. Fire Ins.*, 42 Cal.3d 208 (1986)................................................9
*Gordon v. Deloitte & Touche*, 749 F.3d 746 (9th Cir. 2014)...............................7, 8
*Guebara v. Allstate Ins. Co.*, 237 F.3d 987 (9th Cir. 2001)...................................10
*Hagerty v. American Airlines Long Term Disability Plan*, 2010 U.S. Dist. LEXIS 91995 (N.D. Cal. Sept. 3, 2010)...........................................................14
*Hangarter v. Provident Life*, 373 F.3d 998 (9th Cir. 2004) ...................................23
*Hector v. Wiens*, 533 F.2d 429 (9th Cir. 1976) ........................................................6
*Hubka v. Paul Revere*, 215 F. Supp. 2d 1089 (S.D. Cal. 2002)..................19, 21, 22
*Jebian v. Hewlett-Packard*, 349 F.3d 1098 (9th Cir. 2003)...................................22
*Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062 (2007)...............................9, 10
*Major v. Western Home*, 169 Cal.App.4th 1197 (2009) ........................................25
*Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617 (1996) ..................22
*McOsker v. Paul Revere*, 279 F.3d 586 (8th Cir. 2002).........................................12
*Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3rd Cir. 1997) .............................15
*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623 (9th Cir. 2009)...............14

*Muraoka v. Budget Rent-A-Car*, 160 Cal. App. 3d 107 (1984) ................................7

*Nagy v. Grp. Long Term Disability Plan*, 183 F. Supp. 3d 1015 (N.D. Cal. 2016) ..............................................................................................................15

*O'Neil v. Coll. Loan Special Purpose*, 2006 WL 1742836 (Cal. Ct. App. June 27, 2006) ...............................................................................................................7

*Orzechowski v. Boeing Co.*, 856 F.3d 686 (9th Cir. 2017) ....................................15

*Perryman v. Provident Life*, 690 F. Supp. 2d 917 (D. Ariz. 2010) .........................15

*Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455 (9th Cir. 1996).............................14

*Saffon v. Wells Fargo*, 522 F.3d 863 (9th Cir. 2008) ............................................12

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011)..14, 15

*Sankovich v. Ins. Co. of N. Am.*, 638 F.2d 136 (9th Cir. 1981) ................................6

*Shade Foods, Inc. v. Innovative Products Sales & Marketing*, 78 Cal. App. 4th 847 (2000) ........................................................................................23

*Shaw v. AT&T*, 795 F.3d 538 (6th Cir. 2015).........................................................19

*Spray, Gould & Bowers v. Associated Internat. Ins. Co.*, 71 Cal. App. 4th 1260 (1999)……………………………………………………………………………7

*Walker v. City of San Clemente*, 239 Cal. App. 4th 1350 (2015)..........................6,7

*Wetzel v. Lou Ehlers*, 222 F.3d 643 (9th Cir. 2000)................................................8

*Williams v. United Omaha*, 2013 WL 5519525 (N. D. Ala., Sept. 30, 2013).........22

*Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713 (2007).........................................9

**Statutes**

Cal. Civil Code § 3294 ..................................................................................24, 25

**Rules**

Section 502(a).............................................................................................................4

Fed. R. Civ. P. 56(c) ...................................................................................................6

**Regulations**

10 Cal. Code Regs §2695.4 (a)…………………………………………………..23

## 1. INTRODUCTION

This Court must deny Defendant Dearborn National Life Insurance Company's ("Dearborn") Motion for Partial Summary Judgment, a drastic remedy, for several reasons. First, Dearborn is equitably estopped from asserting its statute of limitations defense because it repeatedly misrepresented to Plaintiff Stephanie Jensen that federal ERISA law applied to her group long-term disability insurance policy ("Policy"), which false statements she reasonably relied on to her detriment causing her to miss the shorter, applicable California statute of limitations.

Second, overwhelming evidence exists in the record that Dearborn acted unreasonably under the totality of the circumstances by terminating Ms. Jensen's disability benefits based on a deficient investigation and, therefore, in bad faith. The material facts are not undisputed as Dearborn erroneously claims, many of which it failed to bring to the Court's attention. This Court must, therefore, allow a jury to decide whether Dearborn breached the implied covenant of good faith and fair dealing owed to Ms. Jensen.

After paying her claim for a decade, Dearborn terminated Ms. Jensen's benefits under the pretext that she had failed to provide current medical records from her treating physician, Randy Baker, M.D. The glaring flaw in its investigation, Dearborn ignored Ms. Jensen's request to contact her if it had any trouble obtaining her medical records, then seized on the opportunity to take her off claim when Dr. Baker did not timely respond. Dr. Baker was in the middle of a personal tragedy caring for his wife whom fell terminally ill the same month Dearborn asked for his medical files.

When it could no longer use that excuse because Dr. Baker provided his records to Dearborn on appeal (which included his opinion that Ms. Jensen was "without question" obviously still disabled based on his numerous in-person exams and that in his "many years of medical practice I cannot recall seeing a greater injustice to a patient at the hands of an insurer"), Dearborn ignored his opinion and

relied on "paper reviews" of her medical files by two insurance industry doctors it hired. Dearborn's decision to do so was blatantly unreasonable because its' consultants reports are patently defective on their face. They concluded that Ms. Jensen was not disabled only because her medical files did not include *objective* evidence that she has chronic fatigue syndrome ("CFS"), fibromyalgia, mercury toxicity and cognitive impairment. Aside from the fact that the Policy does not require objective evidence of disability, it is well-recognized in the legal, medical and insurance claims handling communities that it is not even possible to provide objective evidence for CFS and fibromyalgia, yet they are disabling conditions. The Ninth Circuit held it is "of course absurd" for a disability insurer to require objective evidence for CFS, and it acts unreasonably when it does. Moreover, Dearborn had paid Ms. Jensen's claim for years without objective evidence of her CFS, suggesting it was using the lack of such evidence as another pretext to terminate her benefits.

In the ten months leading up to its termination of Ms. Jensen's disability benefits, Dearborn interrupted her monthly payments several times for invalid, contrived reasons. It claimed it "forgot" to release payments. Another time, Dearborn threatened to collect from Ms. Jensen *a massive $237,000 purported overpayment* and suspended her monthly benefit pending repayment. But Ms. Jensen had already proven two times before that Dearborn's argument was incorrect.

Ultimately, Dearborn unreasonably changed its position about Ms. Jensen's disability status, from disabled to "not disabled," without any evidence that her medical condition improved, violating well-established case law. It ignored a medical expert's instruction, Dr. Baker, that it should obtain a current mercury level test if it required objective evidence of disability. Because, in his opinion, Ms. Jensen was still so obviously disabled from symptoms of mercury toxicity, CFS and cognitive impairment witnessed during his exams, but he had not done a heavy metals test for years. Finally, convincing evidence exists that Dearborn intentionally misrepresented that federal ERISA law applied to avoid liability for

bad faith under California law, which allows much larger remedies.

This collective evidence proves, when drawing all reasonable inferences in Ms. Jensen's favor as the Court must on summary judgment, that genuine issues of material fact exist about whether Dearborn acted unreasonably, and with fraud, oppression or malice, when it terminated benefits. Accordingly, summary judgment on Ms. Jensen's bad faith and punitive damage claims are unequivocally improper.

## 2. STATEMENT OF RELEVANT FACTS

At the time Ms. Jensen sent her November 4, 2013 appeal letter to Dearborn, she was unclear which laws applied to her disability claim. She did not know whether California bad faith law applied, federal ERISA law, some other laws or both. She had spoken with several lawyers and reviewed their Websites around that time, but she did not retain them. She had only very brief "intake" phone consults with them lasting ten minutes or less. These lawyers did not take the time to understand her case or review documents in it, and they refused to give Ms. Jensen any advice unless she hired them. She came away from her brief consults with them unsure about what law applied to her matter or what statute of limitations might apply. Ms. Jensen asserted California bad faith law applied in her November 2013 appeal letter to Dearborn just in case it did because, based on reviewing attorney Websites shortly before she appealed, she learned that California bad faith law allows for larger damages than ERISA does. So, she alleged California law applied, yet she was still confused about whether it did. SDF 1-8.

While in her November 2013 appeal letter Ms. Jensen asserted that California bad faith law applied, Dearborn told her she was wrong, that ERISA applied, on at least two occasions *after that*. First, in mid-December 2013 or early January 2014, Ms. Jensen spoke on the phone with a Dearborn supervisor named "Deborah" where she threatened to go to another insurance commissioner if Dearborn did not stop taking so much time. In response to Ms. Jensen's question about when Dearborn would respond to her appeal, Deborah told Ms. Jensen that under federal law



MCKENNON LAW GROUP PC

Dearborn could unilaterally take an extension of time to respond if it needed one. Ms. Jensen looked up the federal law of which Deborah had referred on a federal labor law Website. It was an ERISA law, which lead Ms. Jensen to believe that federal ERISA law applied to her claim. SDF 9-13.

Second, on January 29, 2014, when responding to Ms. Jensen's November 2013 appeal letter contending that California bad faith law applied, Deborah Stuhr of Dearborn directly told Ms. Jensen that ERISA applied. Stuhr wrote to Ms. Jensen in Dearborn's appeal denial letter, "Under Section 502(a) of the Employee Retirement Income Security Act of 1974, you have the right to file suit for benefits." That cemented in Ms. Jensen's mind that ERISA applied and that she had been wrong in her appeal letter when she had stated to Dearborn, three months prior, that California bad faith law applied. Ms. Jensen had at least one other telephone call with a Dearborn representative that she cannot recall as clearly but where Dearborn again told her ERISA applied. SDF 14-18.

Ms. Jensen relied on what Dearborn had thrice told her, that federal ERISA law applied to her claim, for many reasons: she is not an expert in insurance law; she understood that Dearborn was an expert, likely makes ERISA vs. non-ERISA determinations routinely and that as a large insurer had persons who specialized in these decisions to ensure they do not misrepresent such an important issue; she understood that insurers like Dearborn are regulated by state departments of insurance to enforce laws and regulations about not misrepresenting facts to insureds; Dearborn was responding to her appeal letter claiming California bad faith laws applied, yet Dearborn told her she was wrong, that ERISA applied; she assumed Dearborn's statement that ERISA applied was carefully considered (likely by its lawyers), was reviewed and was authoritative since Dearborn's lower level claim advocates had supervisors on the claim, including two "Deborahs;" she believed Dearborn had an obligation to tell the truth; knew better than she; and knew the Policy and the laws governing ERISA vs. non-ERISA. From 2013 to 2017, Ms.

Jensen was extremely ill, trying to keep a roof over her head, dealing with a foreclosure and her terminally ill father. She reasonably relied on what Dearborn, told her: that ERISA applied, after having already tried to research and unsuccessfully discern whether it did. SDF 19-21.

Based on what Dearborn represented to her, Ms. Jensen did not think she needed to comply with any California statute of limitation period. Because Dearborn told her ERISA applied, she conducted Website searches on "ERISA bad faith" in February 2014, which indicated to her that ERISA had a four-year statute of limitations. She was led to those Websites based on what Dearborn told her. Based on her investigation, she understood that she had four years to file since any California limitations period did not apply and ERISA did. Ms. Jensen thought she had until late September 2017 (i.e., four years from when Dearborn initially terminated her benefits by its September 30, 2013 denial letter to her), or possibly until January 2018 (four years from the January 2014 appeal denial). SDF 22-25.

Ms. Jensen spoke with another lawyer in 2017, still believing ERISA applied based on what Dearborn had told her.[1] She came away from the 2017 discussion confused about whether ERISA or bad faith applied. She still thought ERISA applied but was not certain. None of the lawyers she spoke with gave her a clear answer which law or statute of limitations applied, and each said they could not give her advice or an accurate answer unless she retained them. SDF 26-29.

Ms. Jensen filed her lawsuit on September 29, 2017. She filed it on that date to make sure she met a four-year statute of limitation. Until August 2017, Ms. Jensen relied on what Dearborn had told her, that ERISA applied. She filed in September 2017 instead of January 2018 just in case a four-year limitations started from Dearborn's initial September 2013 denial instead of its January 2014 appeal denial. Ms. Jensen was *in pro per* when she filed suit and thought she would file with the bad faith because she wanted to be able to tell all the egregious bad faith

[1] This occurred after the two-year bad faith statute of limitations expired in January 2016.

things Dearborn had done, since it had bigger remedies, because she did not want to lose that opportunity and because she learned in August 2017 for the first time ERISA likely did not apply. SDF 30-35.

Dearborn misrepresented that federal ERISA law applies. California law applies because the Policy was issued to a government employer, MROSD. SDF 36. Ms. Jensen never knew or understood that California law or the two-year bad faith limitations period applied until August 2017 because she relied until then on what Dearborn repeatedly told her, that ERISA applied. SDF 37.

Ms. Jensen retained a claims handling expert that reviewed Dearborn's entire claim file, Laura Parker. Ms. Parker concluded that Dearborn acted unreasonably in terminating Ms. Jensen's disability benefits and knew it was. SDF 112-115.[2]

## 3. THE COURT MUST DENY DEARBORN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Dearborn's Difficult Summary Judgment Burden

Summary judgment is an extreme remedy and is proper only where "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn from the facts, summary judgment is inappropriate. *Sankovich v. Ins. Co. of N. Am.*, 638 F.2d 136, 140 (9th Cir. 1981).

### B. Dearborn Is Equitably Estopped from Asserting Its Statute of Limitations Defense

Dearborn is equitably estopped from asserting the two-year bad faith statute of limitations because it misrepresented to Ms. Jensen that ERISA applied (which has a four-year statute), which she reasonably relied on to her detriment causing her to miss the two-year period. *See Walker v. City of San Clemente*, 239 Cal. App. 4th

[2] The other facts relevant to prove Dearborn breached the implied covenant of good faith and fair dealing (i.e., acted in bad faith) and with the requisite intent to justify punitive damages are included within the argument sections of this brief, as space did not permit including them here.

1350, 1370 (2015) ("A party may be equitably estopped to assert the statute of limitations when his or her conduct induced another not to file a lawsuit within the applicable limitations period."); *Muraoka v. Budget Rent-A-Car*, 160 Cal. App. 3d 107, 115-18 (1984), abrogated on other grounds as stated in *O'Neil v. Coll. Loan Special Purpose*, 2006 WL 1742836, at *5 (Cal. Ct. App. June 27, 2006) (same); "Actual fraud in the technical sense, bad faith, or an intent to mislead, are not essential to create such an estoppel." *Id.* at 116. "As a general rule, a defendant will be estopped from setting up a statute-of-limitations defense when its own prior representations or conduct have caused the plaintiff to run afoul of the statute and it is equitable to hold the defendant responsible for that result." *Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365, 1371-72 (9th Cir. 1985).

The elements of estoppel to assert the statute of limitations under California law include: (1) That defendant said or did something that caused plaintiff to believe that it would not be necessary to file a lawsuit; (2) That plaintiff relied on defendant's conduct and therefore did not file the lawsuit within the time otherwise required; (3) That a reasonable person in plaintiff's position would have relied on defendant's conduct; (4) That after the limitation period had expired, defendant's representations by words or conduct proved to not be true; and (5) That plaintiff proceeded diligently to file suit once she discovered the need to proceed. *See* CACI No. 456.[3] All the elements are easily met here. *See* SDF 1-37.

The Ninth Circuit recognized an estoppel theory in an ERISA case that is identical to what occurred to Ms. Jensen. *See Gordon v. Deloitte & Touche*, 749 F.3d 746, 751-752 (9th Cir. 2014). *Gordon* is extremely persuasive, especially because *Gordon* borrowed from California estoppel law. *Id.* at 752. The court

[3] *See also Spray, Gould & Bowers v. Associated Internat. Ins. Co.*, 71 Cal. App. 4th 1260, 1268 (1999): Four elements must ordinarily be proved to establish an equitable estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury.

stated, at pp. 751-752:

> **Gordon contends that the Plan should be estopped from asserting a statute of limitation defense based on MetLife's representation that she could bring an ERISA action.** In certain circumstances, we have recognized the applicability of estoppel in ERISA cases to prevent an insurance company from relying on a statute of limitation or contractual limitation period as a defense. " '**As a general rule, a defendant will be estopped from setting up a statute-of-limitations defense when its own prior representations or conduct have caused the plaintiff to run afoul of the statute** . . .
>
> Here, nothing suggests that Gordon missed the statute of limitation deadline because she detrimentally relied on any representation by MetLife. It is true that **MetLife represented in its December 8, 2009 letter that Gordon could bring an ERISA action**, but by then the statute had already run, and so Gordon could not have relied on that statement to her detriment. (Emp. added).

Unlike in *Gordon*, here, the two-year bad faith limitation period had not run when Dearborn misrepresented that ERISA applied to Ms. Jensen. Dearborn represented that to her in January 2014, in a telephone conversation and appeal denial letter. Dearborn concedes that the two-year statute did not run until two years later, in January 2016. Ms. Jensen reasonably relied on that misrepresentation to her detriment, causing her to miss the two-year California bad faith limitations period and file in September 2017. ERISA has a four-year statute of limitations. *See Wetzel v. Lou Ehlers*, 222 F.3d 643, 647-48 (9th Cir. 2000). Ms. Jensen reasonably believed a four-year rather than two-year limitations period applied based on Dearborn's ERISA misrepresentations, which caused her to miss the bad faith deadline but meet ERISA's four-year limit (which expired in January 2018). Therefore, Dearborn is equitably estopped from asserting the applicable two-year limitations period.

Dearborn had a duty not to affirmatively misrepresent to Ms. Jensen that ERISA applied (which Dearborn did), lulling her into missing the two-year statute. Therefore, the case law on which Dearborn relies is inapposite, and it is equitably estopped from asserting its time-based defense.

### C. Dearborn Breached the Covenant of Good Faith and Fair Dealing Implied in Its Group Disability Policy

#### 1) The Bad Faith Standard

A covenant of good faith and fair dealing is implied in every insurance



M L G McKENNON LAW GROUP PC

contract. *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1071 (2007). An insurer is said to act in "bad faith" when it breaches that covenant in dealing with its insured. *Id.* The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. *Id.* at 1071-72. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. *Id.* at 1072. When the insurer unreasonably denies payment of its insured's claim, it is subject to tort liability. *Id.* at 1072-73.

"Before an insurer can be found to have acted in bad faith for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause.*" *Id*. at 1072 (italics in original). The critical issue in determining bad faith is "the reasonableness of the insurer's conduct under the facts of the particular case . . .. An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723 (2007).

2) <u>Dearborn Breached the Covenant by Terminating Ms. Jensen's Disability Benefits Based on Absurd Logic and a Cursory Investigation Rather than Thoroughly Investigating with "An Eye Toward Finding Coverage" as Its Good Faith Duty Required</u>

Dearborn breached the implied covenant of good faith and fair dealing by unreasonably terminating Ms. Jensen's disability benefits without first thoroughly investigating her claim. It failed to search out the available evidence that might support coverage. The implied covenant of good faith and fair dealing requires an insurer "to thoroughly and fairly investigate, process and evaluate the insured's claim." *Wilson*, 42 Cal. 4th at 723. The insurer's unreasonable failure to conduct a thorough investigation amounts to bad faith. *See Jordan, supra*, 148 Cal. App. 4th at 1072 citing *Frommoethelydo v. Fire Ins.*, 42 Cal.3d 208, 214-215 (1986) ("And *an insurer cannot reasonably and in good faith deny payments to its insured without*

*fully investigating the grounds for its denial.*" (italics added by *Jordan* court)).[4] The duty to investigate is not passive but requires the insurer to affirmatively look for all possible bases that might support coverage under the policy. Indeed, the California "Supreme Court emphasized that, in order to protect the interests of its insured, it was 'essential that an insurer *fully* inquire into *possible* bases that *might* support the insured's claim.'" *Id.* citing *Egan v. Mutual of Omaha*, 24 Cal.3d 809, 819 (1979) (italics added by *Jordan* court). A biased investigation is also bad faith, i.e., where an insurer dishonestly selects its experts or where the insurer's experts themselves acted unreasonably. *Guebara*, *supra*, 237 F.3d at 996.

Here, Dearborn's unreasonable claims handling conduct was evident from the beginning of its investigation. Its claim "advocate" Diane Eirich ("Eirich") started her "march toward bad faith" in the ten months leading up to Dearborn formally terminating Ms. Jensen's benefits. She manufactured excuse after excuse to stop and delay paying that were patently unreasonable. Eirich claimed she "forgot" to release payment. SDF 70. She backdated benefit checks and letters. SDF 71. She tried to intimidate Ms. Jensen by threatening her with a massive $237,000 purported overpayment that had no basis in fact, despite obvious evidence in the claim file undermining Dearborn's position. Ms. Jensen had already repeatedly provided Dearborn proof that she did not qualify for SSDI or PERS, the foundation for the threatened overpayment, but Eirich ignored it. She threatened Ms. Jensen with this massive financial exposure to get her to abandon her monthly benefit. She made rude, sarcastic, belittling comments throughout the process. SDF 65-74.

When that did not work, Dearborn formally terminated Ms. Jensen's benefits. Dearborn acted unreasonably under the circumstances, and failed to conduct a thorough investigation before terminating them, in at least four material respects. Plaintiff's claims handling expert, Ms. Parker, concluded that Dearborn acted

[4] *See also Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir. 2001); *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1163-64 (9th Cir. 2002).



McKENNON LAW GROUP PC

unreasonably by recklessly demanding the overpayment, in each of these four respects and many others. Moreover, that Dearborn knew it was improperly withholding Ms. Jensen's disability income and knew that it should have paid her under the Policy but intentionally did not. *See* SDF 112-115.

First, as to its initial September 2013 claim denial, Dearborn primarily relied on the purported lack of current medical records as the reason to terminate Ms. Jensen's disability benefits. SDF 81-82. It claimed it was not able to obtain current records from her family physician (that had regularly treated her for mercury poisoning and CFS), Dr. Baker. *Id.* Dearborn should have known, had it bothered to conduct a thorough investigation, that Dr. Baker at the time of its medical records request was amid a family emergency and, therefore, could not provide responsive records on Dearborn's timeline. Dr. Baker was caring for his terminally ill wife, taking care of his young children and trying to run a busy medical practice. SDF 76-80, 83-84, 86-87. Dearborn should have waited to obtain his medical records, but it did not because it was interested in finding any way to terminate Ms. Jensen's benefits in violation of its good faith covenant duties. So, it did under the pretext that her current medical records did not support her clam. The glaring flaw in its contrived reasoning – it had not bothered to obtain updated records from her most important treating physician, violating its good faith duty to investigate and not to deny a claim based on incomplete information. *See* SDF 75-87, 115B.

Dearborn's conduct is particularly egregious under the circumstances because Ms. Jensen had anticipated this problem with Dr. Baker based on his past delays in providing records. SDF 76, 86. She thus advised Dearborn, in May 2013 when it told her that it was starting to get her updated medical records, that if it had any problems or delays with Dr. Baker or her other doctors, to please call her so she could personally assist in getting Dearborn the records it needed. SDF 75-76, 86. Dearborn ignored Ms. Jensen's request. SDF 77, 80-81. That violated Dearborn's good faith covenant duty to adequately communicate with its insured and "bring to

the insured's attention relevant information so as to enable the insured to take action to secure rights afforded by the policy." *City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 491 (2008), as modified on denial of reh'g (Aug. 28, 2008).[5] Had Dearborn done so, Ms. Jensen would have provided it with the requested medical records (which she and Dr. Baker did on appeal). SDF 83, 87. But, Dearborn was eager to terminate paying Ms. Jensen's longstanding claim (which it had paid for a decade), and it saw a pretextual opening to do so. SDF 85. That is, that she had (purportedly) failed to provide adequate, updated proof of loss that she remained disabled as required by the Policy.

Second, Dearborn acted unreasonably because it changed its position about Ms. Jensen's disability status, from disabled to "not disabled," without evidence that her medical condition improved. That was unequivocally improper under applicable case law. *See Saffon v. Wells Fargo*, 522 F.3d 863, 871 (9th Cir. 2008) ("MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration.")[6] Dearborn and its predecessors paid Ms. Jensen disability benefits for a decade, from 2003 to 2013. SDF 37B, 53. Based on her medical records, it concluded she was disabled from performing the duties of any type of occupation during that entire time. SDF 38-39, 53. It then reversed course and terminated her benefits despite no new evidence establishing that her condition had improved. Dr. Baker testified that, "One major concern I have is that her disability insurer recognized that Ms. Jensen was disabled from 2003 to 2013 then arbitrarily decided she was no longer disabled (and, in their

---

[5] *See also Anderson v. Allstate Ins. Co.*, 45 F. App'x 754, 758 (9th Cir. 2002) (upholding jury's finding of bad faith in part based on insurer "failing to communicate" with its insured).

[6] *See also Fifield v. HM Life Ins. Co.*, 2012 U.S. Dist. LEXIS 140880, *21 (D.N.H. 2012); *McOsker v. Paul Revere*, 279 F.3d 586, 589 (8th Cir. 2002). While these cases were decided under ERISA, they are persuasive because they found that the insurer's conduct was arbitrary, capricious and abused their discretion to decide whether disability benefits were payable under the policy, which is tantamount to an insurer acting unreasonably or in bad faith, the requisite standard under California law.

opinion able to return to work) with absolutely no evidence of any kind that any of her disabling conditions had improved and she was capable of working." SDF 90, 92. His medical progress note dated the *same day* that Dearborn terminated her benefits proves that she had not improved, in fact that she had been bedridden for months because of sheer exhaustion and pain. SDF 88, 91-92. Because Dearborn decided Ms. Jensen was no longer disabled without substantial new medical evidence that her condition had improved, its decision to terminate her benefits was unreasonable under well-established law. SDF 45-64,87-94, 98, 103, 115F, 118-119.

Third, Dearborn acted unreasonably by relying on *obviously deficient* "paper reviews" of her medical records as the sole support for its appeal denial. The reports from its two internal medicine consultants, Steven Channick, M.D. and Michael Gross, M.D., were patently defective on their face, obviously flawed even from casually reading them. Most important, they each concluded there was no *objective* evidence in the medical records that Ms. Jensen was disabled from her reported conditions, including chronic fatigue syndrome, fibromyalgia, mercury toxicity and others. SDF 104. That is preposterous logic that violates the Policy's disability standard, firmly rooted law and universally accepted medical standards, and which Dearborn should have rejected outright. SDF 40-41, 48-50, 52, 93, 100-113, 116-18.

The Policy does not require a claimant to submit objective evidence of her disability. SDF 41. It requires only that a claimant provide "satisfactory proof of loss" such as: "a completed claims statement signed by you;" a completed claim statement signed by the Employer; "a completed claims statement signed by your treating Physician;" "Your written authorization for us to obtain the records and information (including tax returns) needed to determine your eligibility for LTD Benefits;" and "such other documents as we may reasonably require, including copies of your tax returns." SDF 41. The word "objective" does not even appear in the Policy. SDF 41. Thus, the medical consultants' reports, and Dearborn by adopting them, required Ms. Jensen to meet a heightened standard for disability

benefits that is not in the Policy.

That is unreasonable claims handling. Numerous California courts have ruled that requiring the claimant to meet a standard of evidence not set forth in the group policy is an abuse of whatever discretion is afforded the claim administrator and requires that the claim decision be overturned. For example, in *Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 459-60 (9th Cir. 1996), the Ninth Circuit ruled that requiring a claimant to meet a standard that is not present in the plan documents "effectively imposes a new requirement for coverage," but because "an administrator lacks discretion to rewrite the Plan," to do so is an abuse of discretion. In *Hagerty v. American Airlines*, 2010 WL 3463620 (N.D. Cal. Sept. 3, 2010), the court noted that "several . . . courts found it error to require objective medical evidence of complaints that are inherently subjective in nature." *Id.* at *2 (citing *Montour v. Hartford Life*, 588 F.3d 623, 635 (9th Cir. 2009) ("unreasonable for Hartford to require Montour to produce objective proof of his pain level")). The *Hagerty* court ruled that "requiring objective medical evidence of fatigue, when The Plan documents do not expressly require such proof, is a factor suggesting The Plan abused its discretion." *Id.* at *2. Similarly, here, Dearborn requiring "objective clinical findings" to establish disabling CFS and fibromyalgia, SDF 100, 104-111, 117, when the Policy requires only "adequate proof of loss" proves that it made an obviously incorrect benefits decision based on a heightened standard of proof not required by the Policy and, therefore, acted in bad faith.

Dearborn acted unreasonably by requiring an impossible standard of proof, objective evidence for medical conditions that are inherently subjective in nature, CFS and fibromyalgia. The Ninth Circuit addressed that precise issue and held the plan administrator acted unreasonably by denying disability benefits under those circumstances. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011). The court recognized the medical fact that chronic fatigue syndrome (and similar conditions like fibromyalgia) cannot be diagnosed based on

objective proof like X rays, blood tests or other diagnostic measures. And, therefore, it explained that claim administrators abuse their discretion when they demand objective proof for such subjectively diagnosed conditions, as Dearborn did here. *Id.* at 676-80. Ms. Parker opined Dearborn acted unreasonably by doing so.

Many courts have directly addressed the issue of whether objective evidence is required to prove disability where the claimant alleges she is disabled by CFS or fibromyalgia. The courts have universally held it is not, reasoning that requiring objective evidence of these conditions is **"of course absurd"** because it is widely recognized in the legal and medical communities that there is not a medically available objective test to diagnose them, yet they are universally recognized as severe disabilities.[7]

One of Dearborn's *own medical consultants*, Dr. Channick, conceded it is not medically possible to provide objective evidence of CFS. He stated in his opinion report to Dearborn, "In regards to chronic fatigue, individuals with this disorder have no identifiable objective medical basis for their symptoms; that is, individuals with this disorder report symptoms but have normal physical examinations and normal findings on diagnostic testing. Consequently, there is no objective medical basis upon which to predicate work restrictions or accommodations." SDF 106. But Dearborn ignored that opinion from its own expert and obstinately denied the claim based on the lack of objective evidence (SDF 107), patently absurd logic that violates the Policy, the law and medically accepted standards well known by the average disability claims person. SDF 41, 113, 116. That is classic bad faith.

Dearborn's decision to ignore Ms. Jensen's CFS and fibromyalgia diagnoses, resulting disability finding by her treating physicians, her self-reported symptoms

[7] *See Cook v. Liberty Life*, 320 F.3d 11, 21-22 (1st Cir. 2003); *Orzechowski v. Boeing Co.*, 856 F.3d 686, 695-96 (9th Cir. 2017); *Salomaa*, *supra*, 642 F.3d at 678-80 (**holding it was "of course absurd" for disability insurer to require objective evidence of CFS as a condition to paying disability benefits**) (emphasis added); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 443 (3rd Cir. 1997) (abrogated on other grounds); *Nagy v. Grp. Long Term Disability Plan*, 183 F. Supp. 3d 1015, 1028, 1031 (N.D. Cal. 2016); and *Perryman v. Provident Life*, 690 F. Supp. 2d 917, 945 (D. Ariz. 2010).

and subjective complaints of severe, disabling fatigue and pain, and demand that she provide objective clinical findings proving she has CFS and fibromyalgia (when that is not even medically possible to provide), represents an "absurd" request and improper attempt to rewrite the Policy in Dearborn's favor. Enforcing this unwarranted requirement strongly evidences that Dearborn did not provide Ms. Jensen with a fair review of her claim for benefits and acted unreasonably.

The evidence suggests that Dearborn knew it was legally and medically unreasonable to require objective medical evidence for CFS when it denied her appeal, yet still did to cater to its own financial interests. Again, Dearborn's *own expert* told it in his report it was not medically possible to objectively prove CFS. Moreover, the very same type of medical records Dearborn used to accept and pay Ms. Jensen's claim it later used to terminate it. SDF 119; *see also* SDF 45-64, 87-94, 98, 103-110, 115F, 117-119. There had not been any mercury toxicity tests for seven years, since 2006, yet Dearborn continued paying the claim until 2013 based on Dr. Baker's opinion that Ms. Jensen had disabling CFS, mercury toxicity and other conditions. SDF 119. There never was objective evidence of CFS, but Dearborn accepted and paid the claim for a decade despite that based on Dr. Baker's diagnosis and Ms. Jensen's subjective self-reports of fatigue. SDF 119. Nothing changed in the type of evidence that Ms. Jensen provided over the years, just Dearborn's claim decision. SDF 119. The most reasonable inference from this evidence is that Dearborn knowingly used an unreasonable, incorrect reason as a pretext to terminate Ms. Jensen's benefits – that there was no objective evidence of Ms. Jensen's disability.

*AMCO Ins. Co. v. Madera*, 2006 WL 2091944, at *39 (E.D. Cal. July 26, 2006) is instructive. The court stated, "Using an expert's opinion that lacks a firm basis, and is contrary to the weight of expert evidence, as a pretext to end contractual benefits could be construed by a reasonable juror as clear and convincing evidence of a conscious disregard of a plaintiff's rights" entitling the

insured to punitive damages. The *AMCO* court held a reasonable jury could find the insurer in that case acted in bad faith and in fact maliciously warranting punitive damages, despite obtaining a favorable report from its expert witness, because there was evidence that the insured conducted a biased investigation aimed at supporting its intention to deny the claim, just like Dearborn's conduct in investigating and denying Ms. Jensen's claim based on patently defective expert reports. *Id.* at *38. Here, the weight of the expert evidence that existed when Dearborn denied the claim (the treating physicians' opinions based on their years of in-person exams), which were more reliable than Drs. Gross' and Channick's purely "paper reviews" of the file, was that Ms. Jensen was disabled from CFS, fibromyalgia, mercury toxicity and other comorbidities. SDF 46, 55, 62-64, 87-118. Dearborn's reliance on its peer reviews to deny the claim without investigating further amounts to bad faith, as their opinions were obviously deficient on their face from even a casual reading of their reports, and ignored more reliable expert evidence based on in-person exams.

Fourth, the evidence shows Dearborn was not interested in objectively seeking the truth about the merits of Ms. Jensen's claim. If it were, the reasonable response to Dr. Baker's January 2014 report (recommending that Dearborn obtain her current mercury levels), would have been to follow his recommendation. He concluded in his report that, based on his regular in-person exams for many years, Ms. Jensen was obviously disabled from mercury toxicity, CFS and fibromyalgia. SDF 46, 93. And, that while Ms. Jensen was still displaying disabling symptoms of mercury toxicity in 2013-2014, it would be appropriate to diagnostically retest her current levels since the last test he completed was in 2006. SDF 57-59, 93. Rather than follow his advice, Dearborn relied on insurance doctors with absurd opinions that contradicted well-established legal and medical standards, to terminate her benefits. Dearborn ignored Dr. Baker's obvious solution to even that purported problem – lack of objective evidence – get a current mercury level test. SDF 95.

It was patently unreasonable for Dearborn to ignore Dr. Baker's

McKENNON LAW GROUP PC

recommendation, or minimally to obtain an IME, and instead blindly rely on the purely paper review opinions of Drs. Gross and Channick under the circumstances[8] because: (1) they never examined Ms. Jensen; (2) every physician that did, including Drs. Baker and Dan Harper, had concluded that Ms. Jensen was still obviously disabled because of CFS, cognitive impairment, fibromyalgia, mercury toxicity and other comorbid problems; (3) their reports requiring objective evidence of disability for CFS and fibromyalgia were patently defective on their face; (4) those conditions are better diagnosed through an in-person exam; (5) objective evidence was available, at least for mercury toxicity, by following Dr. Baker's recommendation to obtain a current mercury level test; (6) Dearborn conceded Ms. Jensen was disabled by paying her claim for ten years, from 2003 to 2013; and (7) as of 2014, there was *no* evidence that Ms. Jensen's medical condition had improved. SDF 40-41, 44, 46, 53, 56, 59-64, 87-113, 115E-F, 115H, 116-119. Dearborn never should have relied on Drs. Gross' and Channick's biased, patently absurd opinions to terminate Ms. Jensen's benefits under these circumstances.

**If Dearborn had obtained a current mercury level test or conducted an IME in January 2014, as it obviously should have given the circumstances, it would have learned that Ms. Jensen was still disabled from extremely high levels of mercury toxicity. We know that to be true because heavy metal urine tests completed *before and after the October 2013 termination date* objectively prove beyond any doubt that Ms. Jensen had exceedingly high mercury levels.**[9] Dr. Baker testified that, in his opinion, a 2014 test would have shown the same high levels, somewhere between the 2006 and 2018 tests. SDF 96-97. Moreover, during

---

[8] *See Bravo v. U.S. Life Ins. Co. in City of N.Y.*, 701 F. Supp. 2d 1145, 1159-60 (E.D. Cal. 2010) (denying disability insurer's summary judgment motion contending it did not act in bad faith by terminating insured's disability benefits; stating that while an independent medical examination is not a prerequisite to a thorough investigation, "obviously, it bears upon the ultimate issue" and, thus, the insurer's failure to conduct one where the circumstances warrant is a relevant fact that tends to show the insurer acted in bad faith).

[9] Any level above 10 is abnormally high. SDF 57. Ms. Jensen's objective, heavy metals urine tests show mercury levels of: (1) 11/15/2003, 100 micrograms per gram; (2) 10/11/2006, 43 micrograms per gram; (3) 5/19/2018, 69 micrograms per gram. SDF 57-59, 61.

this time Dr. Baker confirmed that she had symptoms of mercury toxicity and certified her as disabled. SDF 60, 98. Yet, Dearborn decided to ignore his opinion and recommendation to get a current mercury level test, not to conduct an IME and rely on far less convincing paper review opinions. SDF 95, 99-102, 40. That speaks volumes about Dearborn's intent and the veracity of its slanted investigation. *See Shaw v. AT&T*, 795 F.3d 538, 550 (6th Cir. 2015) ("the failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, 'raise[s] questions about the thoroughness and accuracy of the benefits determination.' " (citations omitted)); *Bravo*, *supra*, 701 F. Supp. 2d at 1159-60. Similar to *Bravo*, a thorough investigation consummate with Dearborn's good faith duties required it to direct its experts to obtain Ms. Jensen's current mercury levels, or minimally conduct an IME, neither of which it did.

*Hubka v. Paul Revere*, 215 F. Supp. 2d 1089 (S.D. Cal. 2002) is instructive. That court held that conduct by a disability insurer strikingly similar to how Dearborn acted toward Ms. Jensen likely amounted not only to bad faith but malicious, despicable conduct entitling the insured to an award of punitive damages. The insured chiropractor submitted a claim under his "own occupation" disability policy to his insurer supported by opinions from his two treating doctors, a chiropractor and neurologist. They each concluded he was totally disabled from performing his duties as a chiropractor due to injuries sustained to his neck and back. Based thereon, the insurer started paying him monthly benefits but also continued investigating his claim. It surveilled the insured and argued the footage showed him acting inconsistently with his claimed limitations.

It hired a medical consultant to conduct a medical examination, Dr. Schleimer. Dr. Schleimer, based on his exam and review of the insured's medical records, concluded that the insured was disabled from doing "heavy work" because he lost 50% of his capacity to bend, pull, push and lift. He also concluded the insured *might* be precluded from working in his occupation as a chiropractor. But

he recommended the insurer obtain an additional expert opinion from a chiropractor (who would better understand the insured's job duties since he was unfamiliar with them). The insurer neglected to do that. Instead, it had its in-house orthopedic surgeon, Dr. Bianchi, perform a "paper review" of the insured's medical records as well as Dr. Schleimer's IME report. Dr. Bianchi concluded the insured was not disabled based on his paper review, and he rejected the IME from the insurer's medical consultant as his "subjective" opinion unsupported by "objective" x-ray and diagnostic evidence. The insurer thus terminated the insured's disability benefits after paying him for over two years based on the paper review and surveillance. It did so despite that the only physicians that had actually examined the insured concluded he was disabled, the insurer's IME physician recommended additional expert evaluation, and though the insurer failed to follow that recommendation.

The insured filed a lawsuit against his insurer for breach of contract, bad faith and punitive damages. The insurer filed a motion for summary judgment contending it did not act in bad faith and that it could not be liable for punitive damages as a matter of law because, based on its paper reviewer's report, there was a genuine dispute whether the insured was disabled, just as Dearborn did here. The court strongly disagreed and denied the insurer's motion. It reasoned that a reasonable jury could conclude, based on the insurer's aforesaid investigation, that it terminated benefits not just unreasonably and in bad faith, but, that clear and convincing evidence showed it did so maliciously and despicably warranting punitive damages. The court cited the following evidence in the key part of its opinion for the reasons it denied the insurer's partial summary judgment motion on bad faith and punitive damages: the only expert medical opinion that the plaintiff was not disabled was by a non-examining, "paper review" physician hired by the insurer; the plaintiff's treating doctors found him disabled; an examining expert consultant doctor recommended to the insurer that it do an independent chiropractic exam; and the insurer never followed that recommendation. *Id.* at 1094-95.

McKENNON LAW GROUP PC

Dearborn acted almost identically to how the insurer in *Hubka* did. In both cases, the insurance company used a paper review opinion from an insurer hired doctor arguably as a pretext to end disability payments contrary to the weight of the medical evidence, including more reliable in-person exams from treating physicians. In both cases, a doctor that examined the insured determined that further expert evaluation was warranted. In both cases, the only doctor not finding the insured disabled was a non-examining paper reviewer. In both cases, the insurer failed to follow-up on the recommendation of an examining doctor to obtain further expert evaluation. Indeed, examining physician and Stanford expert Dr. Baker concluded, in his January 2014 disability opinion report to Dearborn, that Ms. Jensen was obviously disabled but recommended additional heavy metals testing to satisfy Dearborn's (improper) demands for objective evidence:

> In my many years of medical practice I cannot recall seeing a greater injustice to a patient at the hands of an insurer. . . .
>
> Ms. Jensen is totally disabled due to multiple chronic severe medical conditions . . . The records I have sent, as requested, cover the past 5 years. This does not include the results of her mercury test, as that was more than 5 years ago, but her levels remain by far the highest of any patient of the hundreds of patients I have tested for heavy metal toxicity. ***It would be appropriate to retest her to see if her levels have come down*** but she has not been able to afford this yet.
>
> Ms. Jensen's extremely high level of mercury is known to cause many of the problems she suffers from, including . . . cognitive dysfunction . . . fibromyalgia and debilitating fatigue. . . .
>
> There is absolutely no question that Ms. Jensen's chronic health problems prevent her [from] being able to do any gainful employment at this time nor at any time in the foreseeable future. (Emphasis added). SDF 93.

Just like the insurer in *Hubka*, Dearborn never obtained the recommended investigation. SDF 95. Dearborn ignored Dr. Baker's mercury test recommendation because it knew what it would find – that Ms. Jensen still had extremely high mercury levels confirming Dr. Baker's mercury toxicity diagnosis and disability opinion, and corroborating Ms. Jensen's ongoing complaints of extreme fatigue, pain and impaired concentration, all consistent with mercury toxicity.

Just as in *Hubka*, this case should go to the jury. The Court should deny Dearborn's Motion because the facts establishing its deficient investigation are

strikingly similar to those in *Hubka*. A jury should be given the chance to conclude that Dearborn unreasonably terminated Ms. Jensen's benefits in bad faith with a conscious disregard of her rights warranting tort and exemplary damages.

After deciding that she was disabled and paying her claim for a decade, Dearborn unreasonably terminated Ms. Jensen's disability benefits effective October 2013 based on cursory paper reviews of her medical records by insurance industry physician consultants. Dearborn acted unreasonably by selectively relying on that questionable evidence because much more reliable, contrary evidence was available from the only physicians that had examined Ms. Jensen. Their exams are more credible because Ms. Jensen's main disabling conditions, CFS and fibromyalgia, are largely diagnosed based on the patient's self-reports. Therefore, a doctor that has examined the claimant over a series of years is in a better position to judge her credibility and functional abilities than a medical file reviewer, which even Dearborn's own consultant recognized and thus recommended an IME.[10] SDF 102. The examining physicians all found Ms. Jensen disabled based on years of in-person exams. And, there had been no significant change or improvement in her condition according to her medical records. Dearborn never should have relied on Drs. Gross' and Channick's patently deficient paper review opinions to terminate Ms. Jensen's benefits under these circumstances. It should have followed Dr. Baker's recommendation to get a current mercury level test. Dearborn's skewed investigation bent on denying Ms. Jensen's claim and ignoring the opinions and recommendations of the examining physicians, rather than fully inquiring into all possible bases that might support coverage, amounts to bad faith.[11]

---

[10] *See Jebian v. Hewlett-Packard*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003); *Williams v. United Omaha*, 2013 WL 5519525, at *12 (N. D. Ala., Sept. 30, 2013) ("For [] conditions as subjective and variable as fibromyalgia . . ., direct contact with the patient over a period of time would provide a more thorough opportunity to assess her credibility regarding level of pain and the true pattern of her abilities. Therefore, in the instant case, the court will focus heavily on the opinions and treatment records of Williams' treating physicians[.]")

[11] *See Hubka*, *supra*, 215 F. Supp. 2d 1089; *see also AMCO*, *supra*, 2006 WL 2091944, at *15 citing *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1620 (1996) ("An insurer

Footnote continues on next page…

Based on obviously incomplete information, Dearborn brazenly and unreasonably concluded Ms. Jensen was no longer disabled to cater to its own financial interests over those of its insured. The evidence shows it was bent on terminating benefits at all costs from the beginning. It did so based on a cursory, deficient investigation by consultants who never examined the patient and drew conclusions at odds with the Policy, law and well accepted medical standards to diagnose CFS and fibromyalgia. A reasonable jury could conclude that Dearborn's investigation was unreasonable under these circumstances and, thus, in bad faith.

3) <u>Dearborn Breached the Covenant by Intentionally Misrepresenting to Ms. Jensen that ERISA Applied to the Policy, Entitling Her to Bad Faith and Punitive Damages</u>

Dearborn misrepresented key Policy terms to Ms. Jensen. It claimed that ERISA applied to the Policy when it does not apply. Misrepresenting such critical and basic facts about the Policy's terms breached Dearborn's implied covenant duty of good faith and fair dealing and subjects it to punitive damages. *See Hangarter v. Provident Life*, 373 F.3d 998, 1010-11, fn. 8 (9th Cir. 2004) (upholding jury's bad faith and punitive damage award in part because disability insurer improperly advised the insured in its denial letter that ERISA applied when it did not – and that would mean the insured could not pursue California State law tort remedies including punitive damages but instead only the very nominal remedies that federal ERISA law allows).[12]

Intentionally misrepresenting a policy's terms to avoid bad faith liability

---

may act in bad faith if it seeks to discover only the evidence that defeats the claim and ignores supporting evidence; the insurer has a duty diligently to search for evidence that supports its insured's claim and should consider all the information reasonably available to it at the time it denied the claim . . ."); *id.* at *15 citing *Shade Foods, Inc. v. Innovative Products Sales & Marketing*, 78 Cal. App. 4th 847, 880 (2000) ("An inference of unfair dealing is appropriate where an insurer fails to consider or to seek to discover evidence relevant to the issues of liability and damages, such as where the insurer . . . inexplicably relies on self-serving evidence while ignoring a mass of other available evidence.")

[12] *See also* 10 Cal. Code Regs. § 2695.4(a) ("Every insurer shall disclose to a first party claimant all benefits, coverages, time limits or other provisions that may apply to the claim."); *Davis v. Blue Cross of No. Calif.*, 25 Cal.3d 418, 426-428 (1979) (holding insurer's failure to notify insured of certain policy rights breached the implied covenant of good faith and fair dealing).



McKENNON LAW GROUP PC

warrants punitive damages. *See Delos v. Farmers*, 93 Cal. App. 3d 642, 663-664 (1979); Cal. Civil Code § 3294 (plaintiff entitled to punitive damages where defendant intentionally misrepresents material facts to deprive a person of property or legal rights or otherwise cause injury, or where defendant's despicable conduct is carried on with a willful and conscious disregard of that person's rights).

Here, the most reasonable inference from the evidence is that Dearborn intentionally, knowingly and fraudulently misrepresented the Policy's terms, namely which law applied to it, so that it could disingenuously try to avoid liability for bad faith under California State law and instead face only the very limited remedies permitted by ERISA, placing its own financial interests ahead of the insured. Dearborn terminated Ms. Jensen's benefits and immediately started a campaign to avoid bad faith exposure. In its January 2014 appeal denial letter, when it told Ms. Jensen it would not pay her claim and that the next step was for her to file a lawsuit, Dearborn simultaneously falsely represented to her that ERISA applied to her claim and the Policy. SDF 120.

It should have been obvious to Dearborn's employee Stuhr that California law applied to the Policy, not ERISA, when she made that false statement in the appeal denial letter. She is a quality review specialist and thus would have more training than Dearborn's staff reviewing the initial claim. SDF 121. Moreover, she quoted the Policy's terms in her appeal denial letter and thus must have been familiar with them. SDF 122. Dearborn's claim "advocates" and managers must have handled numerous claims under the Policy. It is a group Policy issued not to an individual but to an employer, MROSD, for the benefit of all its employees. SDF 37A, 123-124. And, MROSD is a midsize *governmental* entity meaning ERISA does not apply. SDF 42-43, 124. The reasonable inference is that Dearborn had handled dozens of claims under the exact Policy over the years from other MROSD employees (not to mention Ms. Jensen's claim for well over a decade). It had to know ERISA did not apply after handling these other prior claims, quoting the



McKENNON LAW GROUP PC

M L McKENNON G LAW GROUP PC

Policy and since MROSD is a government entity. Yet, Dearborn's appeals representative Stuhr and a Dearborn claim manager named "Deborah" still told Ms. Jensen that ERISA applied.[13] They did this right after Ms. Jensen had asserted in her appeal letter that California bad faith law applied to her claim. The most reasonable inference is that Dearborn did so intentionally to mislead Ms. Jensen, avoid bad faith exposure and favor Dearborn's financial interests.

Under these circumstances, for Dearborn to assert that it did not know at the time this most basic fact about its own insurance Policy is absurd. The reasonable inference supported by the evidence certainly at the summary judgment stage is that Dearborn knew that California law applied when it lied to Ms. Jensen in its denial letter that ERISA applied. Not surprisingly, Dearborn's false statement heavily favored its own financial interests. Dearborn's misrepresentation evidences its unreasonable, bad faith claims handling and an intentional, fraudulent and deceptive effort by Dearborn to exploit the inexperience of Ms. Jensen to avoid extracontractual, tort and punitive damage liability under California's liberal bad faith laws. That is intentional, despicable conduct warranting punitive damages.

## 4. CONCLUSION

Ms. Jensen respectfully requests this Court deny Dearborn's Motion and give her "day in court" in front of a jury of her peers.[14]

Dated: April 30, 2019

McKENNON LAW GROUP PC

By: [signature]

ROBERT J. McKENNON
JOSEPH S. McMILLEN
Attorneys for Plaintiff Stephanie Jensen

[13] Dearborn's argument that it is not liable for punitive damages because it only acted through low-level employees is thus incorrect. *See Major v. Western Home*, 169 Cal.App.4th 1197, 1220-1221 (2009), where a regional insurance claims manager who supervised 35 employees and exercised authority to pay or deny claims was determined a "managing agent" for purposes of awarding punitive damages against the insurer under Civil Code Section 3294.

[14] This Court has the power to submit the estoppel issue to a jury. *See* CACI No. 456 Comments ("This instruction is for use if the court submits the issue to the jury for advisory findings.")

# CERTIFICATE OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., Suite 200, Newport Beach, California 92660; Fax 949-385-5165; E-mail address: dc@mckennonlawgroup.com.

I hereby certify that on APRIL 30, 2019, I served the foregoing documents described as: **PLAINTIFF STEPHANIE JENSEN'S OPPOSITION TO DEARBORN NATIONAL LIFE INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT** on the interested parties as follows:

| | |
|---|---|
| Edward P. Murphy<br>**Foran Glennon Palandech Ponzi & Rudloff PC**<br>2000 Powell St., Suite 900<br>Emeryville, CA 94608<br>510-740-1500<br>510-740-1501 Fax<br>*emurphy@fgppr.com* | Attorneys for Dearborn National Life Insurance Company<br>☒ ECF Participant |

☒ **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System. I served those parties who are not registered participants of the ECF System as indicated below.

☐ I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐ **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐ **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business. The transmission was reported as complete, without error.

☐ **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America and the State of California that the above is true and correct. Executed at Newport Beach, California on April 30, 2019.

NAME: Debi Cartee
(Signature)



MCKENNON LAW GROUP PC